UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

KING MOUNTAIN TOBACCO COMPANY, )
INC.; CONFEDERATED TRIBES AND )  NO.  CV-11-3018-LRS
BANDS OF THE YAKAMA NATION, )
                            )  ORDER RE SUMMARY JUDGMENT
              Plaintiffs,   )  MOTIONS
                            )
       -vs-                 )
                            )
ROBERT McKENNA, ATTORNEY GENERAL )
OF THE STATE OF WASHINGTON, )
                            )
              Defendant.    )
                            )

        BEFORE THE COURT are the cross-motions for summary judgment filed
by the parties on November 9, 2012: Plaintiffs' Motion for Summary
Judgment (ECF No. 85); Defendant's Motion for Summary Judgment (ECF No.
90); and other miscellaneous motions. Oral argument was held on February
11, 2013, and at the conclusion, the motions were taken under advisement.

**I.  BACKGROUND AND FACTS**

        This declaratory judgment and injunctive relief action is brought
by the Plaintiffs against the Washington Attorney General based on
allegations of systematic and continuous violations of: (i) the Treaty
of 1855 between the United States and the Confederated Tribes and Bands

ORDER - 1

of the Yakama Nation; (ii) federal laws; and (iii) tribal laws of the Confederated Tribes and Bands of the Yakama Nation.   Plaintiff King Mountain is a tobacco product manufacturer, owned by Delbert Wheeler, a Yakama Nation member.

In the mid-1990s, Washington and several other states sued cigarette manufacturers, seeking to protect public health and recover costs and other damages incurred by the states due to smoking-related illnesses. In 1998, the States' Attorneys General Litigation against the major tobacco companies resulted in The Master Settlement Agreement ("MSA") between 46 states and tobacco product manufacturers ("Original Participating Manufacturers" or "OPM").  Pursuant to the MSA, the OPMs obtained release of specified past and future tobacco-related claims against them in exchange for an agreement to make substantial annual cash payments to the states in perpetuity to offset the burden that their cigarettes impose or will impose on the public health system.   The payments from the OPMs are designed to compensate the states for expenses they incur as the payers of last resort for health care costs of citizens who suffer smoking-related illnesses.

The MSA carves out three different groups of manufacturers: the OPM, Subsequent Participating Manufacturers, and Non-Participating Manufacturers ("NPM").  The Washington Legislature, like the legislatures of the other settling states, adopted a Qualifying Statute. See Wash. Rev. Code § 70.157.005. In its findings, the Legislature expressly recognized the need to establish a reserve fund to cover the potential

liability of NPMs. Washington's Qualifying Statute requires all NPMs to make payments into qualified escrow accounts or join the MSA. The Qualifying Statute, therefore, requires tobacco product manufacturer Plaintiff King Mountain Tobacco, an NPM, to either join the MSA or deposit funds into escrow, based on the amount of their cigarette sales, that the State would obtain access to in the event of a future settlement or judgment against King Mountain. NPMs, who do not join the MSA, are required to make escrow payments for <u>only</u> those cigarettes or roll-your-own containers that are subject to Washington's cigarette tax, Wash. Rev. Code § 70.157.010(j)-.020(b).

From the Plaintiffs' perspective, the MSA resulted in the enactment of the Washington State Escrow Statutes ("escrow statutes"), which place economic restrictions and preconditions on the ability of NPMs to participate in the tobacco product market. From the Defendant's perspective, the escrow requirement works differently than the State's cigarette taxes. The State obtains access to escrow funds only under certain conditions; otherwise, the funds revert to the tobacco product manufacturer. The financial institution holding the escrow funds may release the funds only (1) to pay a judgment or settlement of a qualifying claim (i.e., state or consumer sues manufacturer for damages due to smoking), (2) to reimburse the manufacturer for amounts above what the NPM would have had to pay had it been a Participating Manufacturer, or (3) to return the escrow funds to the manufacturer 25 years after they were placed into the escrow fund. Wash. Rev. Code § 70.157.020(2). In

ORDER - 3

addition, the manufacturer receives any interest earned on the account on an ongoing basis.

The Washington Attorney General enforces the escrow statutes and must bring a civil action against any NPM that fails to certify compliance with the statute. Wash. Rev. Code § 70.157.020(3). Upon a finding of a second knowing violation of the Qualifying Statute, a court may prohibit the manufacturer from selling cigarettes in Washington (either directly or through a distributor) for a period of two years.

Plaintiff King Mountain engages in a multistate business growing tobacco and manufacturing cigarettes and roll-your-own tobacco. The business involves (1) shipping King Mountain tobacco to Tennessee, where it is threshed, (2) shipping tobacco to North Carolina, where King Mountain tobacco is blended with North Carolina grown (Alliance One) tobacco, (3) transporting the blended tobacco on its trucks from North Carolina back to Washington, (4) advertising its cigarettes in multiple states through trade shows and the Internet, and (5) selling its cigarettes (through a distributor) to retail stores throughout Washington (and multiple other states) that ultimately sell cigarettes to consumers. ECF No. 95.

In 2009, approximately 3.1% of the tobacco used in the resulting cigarettes was grown on reservation land while the rest was purchased from Alliance One. *Id*. In 2010, the amount of King Mountain tobacco was 9.5%, and in 2011, 37.9%. *Id*. King Mountain pays Alliance One by the pound for the blended tobacco. Id. With the exception of a subsequent

ORDER - 4

Native American ceremony to preserve the sacred character of King Mountains' tobacco products, also referred to as "blending," all the blending of King Mountain and Alliance tobacco occurs in North Carolina. *Id*.

King Mountain and its distributor, Mountain Tobacco, sell the cigarettes to distributors throughout Washington and in approximately 16 other states. *Id*. For non-reservation distributors throughout Washington, King Mountain provides those cigarettes to Mountain Tobacco, which then delivers the cigarettes. *Id*. King Mountain delivers cigarettes directly to reservation retailers. *Id*. King Mountain advertises its products at trade shows in multiple states, as well as through the Internet. *Id*.

The Yakama Nation and National Congress of American Indians have taken the position that King Mountain is not subject to the requirements of the Washington escrow statutes. After certifying its escrow obligation in 2007, and generally complying with the escrow requirement for several years under the Qualifying and Complementary Statutes, King Mountain now denies its obligations under State law. The present lawsuit was commenced when the State failed to acknowledge that the economic restrictions and preconditions imposed by the Washington State escrow statutes violate established 1855 Yakama Treaty Rights ("Treaty").

**II. PLAINTIFF'S MOTION TO STRIKE** (ECF No. 74)

Plaintiff moves to strike reports and exclude testimony of Emily Greenwald (ECF No. 74), which motion was filed on November 9, 2012 but

ORDER - 5

deferred by the Court on January 25, 2013 (ECF No. 139).  Plaintiffs argued that Dr. Greenwald's opinions on Article III of the Treaty are barred by the doctrine of collateral estoppel, and are irrelevant, unreliable, and inadmissible. Plaintiffs further argued that Defendant's expert, Dr. Greenwald, Ph.D., is not qualified to opine on the issues addressed in her reports.

Defendant did not use or rely on the testimony of Dr. Greenwald for purposes of its summary judgment motion.  The Court, therefore, denies Plaintiffs' motion to strike as moot.

**III. DEFENDANT'S MOTION TO STRIKE PLAINTIFFS' NEW LEGAL THEORY AND RELATED FACTUAL SUBMISSIONS** (ECF No. 107)

Defendant argues that Plaintiffs improperly raised a new claim of relief, which was not in their First Amended Complaint, in support of their motion for summary judgment. Defendant states that Plaintiffs' complaint asserts only two claims and both rely on the Treaty and other unspecified federal law.  Defendant argues that during the summary judgment motion, Plaintiffs expanded on their argument. Specifically, Plaintiffs explained in the summary judgment that because the Washington Department of Revenue defined certain King Mountain sales as tax exempt, those sales were not "units sold" within the definition set forth in Rev. Code Wash. §70.157.010(j). Plaintiffs concluded that in addition to the Treaty protections exempting King Mountain from State escrow obligations, it is also exempt from State escrow obligations for its on-reservation sales based on the State's determination that these sales are not

taxable.

The Court finds that although the Plaintiffs' First Amended Complaint sets forth claims that rely on the Treaty and other federal law, the information about state tax-exempt products at issue is relevant and tied into the Plaintiffs' lawsuit. Plaintiffs, however, have not offered evidence relating to verifiable state tax-exempt sales for which King Mountain has deposited money into escrow for, as "units sold," that would or should be segregated from the other indirect sales at issue in this lawsuit nor has timely discovery apparently occurred on this issue. Therefore, the motion to strike is granted, in part.

**IV.  APPLICABLE LAW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A key purpose of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex*, 477 U.S. at 327.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The moving party must demonstrate to the Court that there is an

absence of evidence to support the non-moving party's case. See *Celotex Corp.*, 477 U.S. at 325. The burden then shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (*quoting* Fed. R. Civ. P. 56(e)).

A genuine issue of material fact exists if sufficient evidence supports the claimed factual dispute, requiring "a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). At summary judgment, the court draws all reasonable inferences in favor of the nonmoving party. *Dzung Chu v. Oracle Corp.* (*In re Oracle Corp. Secs. Litig.*), 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The evidence presented by both the moving and non-moving parties must be admissible. Fed. R. Civ. P. 56(e). The court will not presume missing facts, and non-specific facts in affidavits are not sufficient to support or undermine a claim. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**V.    CROSS-SUMMARY JUDGMENT MOTIONS**

Plaintiffs assert that King Mountain is engaged in the trade of farming, cultivating, and trading tobacco just as the Yakamas have been for centuries.  The MSA resulted in the enactment of the State escrow statutes, which Plaintiffs complain place economic restrictions and preconditions on the ability of King Mountain, an NPM, to participate in the market. Further, Plaintiffs conclude, the economic restrictions and

preconditions imposed by the State escrow statutes violate established Treaty rights.

**A.    Treaty - Articles II and III**

The first argument raised by Plaintiffs for why King Mountain should not be required to comply with the State escrow statutes is that King Mountain is exempt from such escrow payments under the Treaty of 1855, 12 Stat. 951.   Article II of the Treaty describes the land that was reserved to the Yakama Nation and stated that the "tract shall be set apart and, so far as necessary, surveyed and marked out, *for the exclusive use and benefit* of said confederated tribes and bands of Indians . . . ." *Id*. (emphasis added).   Plaintiffs argue that the language "for exclusive use and benefit" evidences an intent by the United States to not restrict certain activities, including the manufacturing of tobacco products and trade.   Also, it was the Yakamas understanding that Article II was a guarantee that they would always have the "exclusive use and benefit" of the income from their lands.

The second argument advanced by Plaintiffs is that, as a matter of law, the State escrow statutes are preconditions and economic restrictions that violate Yakama members' Article III Trade and Travel Rights.   Article III of the Treaty of 1855 states, in pertinent part, as follows:

> And provided, that, if necessary for the public convenience, roads may  be run through the said reservation; and on the other hand, the right  of way, with free access from the same to the nearest public highway, is secured to them; as also the right, in common with citizens of the United States, to travel

ORDER - 9

1    upon all public highways.

2

3    Plaintiffs assert that the parties to the Treaty could not have

4    contemplated a State mandate that required Yakama people to surrender

5    revenue generated by them on Yakama land to be held and used for the

6    benefit of the state as a precondition to exercising their

7    Treaty-protected rights to trade in tobacco.  To that end, Plaintiffs

8    reason, the Treaty's recognized broad protections secure King Mountain's

9    right to produce and sell its products in the State of Washington without

10   the encroachments imposed by the State escrow statutes.

11   Plaintiffs assert that the Ninth Circuit has expressly held that

12   Article III protects the Yakamas' right to travel and trade, without

13   restriction, with respect to tobacco products. *United States v. Smiskin*,

14   487 F.3d 1260, 1266-67 (9th Cir. 2007)("Thus, whether the goods at issue

15   are timber or tobacco products, the right to travel overlaps with the

16   right to trade under the Yakama Treaty such that excluding commercial

17   exchanges from its purview would effectively abrogate our decision in

18   Cree II and render the Right to Travel provision truly impotent.");

19   *Yakama Indian Nation v. Flores*, 955 F. Supp. 1229, 1248 (E.D. Wash.

20   1997)(holding that "the language of the  Treaty, when viewed in the

21   historical context as the Yakamas would have understood it, unambiguously

22   reserves to the Yakamas the right to travel the public highways without

23   restriction for purposes of hauling goods to market"); *Cree v. Flores*,

24   157 F.3d 762, 769 (9th Cir. 1998)(affirming the *Flores* district court's

25

26

ORDER - 10

finding that Article III "must be interpreted to guarantee the Yakamas the right to transport goods to market over public highways without payment of fees for use").

In further support of their arguments, Plaintiffs rely on *Smiskin* which held that an Indian treaty "must be construed as the Indians would naturally have understood it at the time of the treaty, with doubtful or ambiguous expressions resolved in the Indians' favor." *United States v. Smiskin*, 487 F.3d 1260,1264 (9th Cir. 2007). It is undisputed, Plaintiffs argue, that before the time of the Treaty, the Yakama were "inveterate traders." *Flores*, 955 F. Supp. at 1238.

In summary, Plaintiffs conclude that as a matter of fact and law, there is no dispute-and Defendant has failed to rebut-that the Yakama understood Article II of the Treaty to guarantee them the right to engage in the historic practice of growing and trading tobacco without any economic impediments, restrictions, or conditions being imposed by any state or the federal government. This conclusion is based on: (1) the historical significance of tobacco being grown by the Yakama and then subsequently traded with other Yakama and non-Yakamas alike; (2) the representations made by the United States representatives to the Yakama at the time of the Treaty negotiations at the Walla Walla Council; and (3) the language of the Treaty itself.

Defendant responds, in opposition to Plaintiffs' Treaty rights arguments, that allowing the Yakamas to travel and use their land are not express exemptions from nondiscriminatory Washington regulation of

ORDER - 11

tobacco products.  Defendant states that Article II merely preserved the physical land for the Indian reservation.  King Mountain engages in an expansive, multistate business growing tobacco and manufacturing cigarettes and roll-your-own tobacco and the broad scope of Plaintiffs' commercial enterprise takes this conduct out of the realm of mere reservation activity.    In other words, when taking into account the manufacturing process involved and the amount of reservation-grown tobacco that is used in King Mountain's products, Defendant asserts that the cigarettes and roll-your-own tobacco produced by King Mountain are not principally generated from the use of reservation land and resources.

Relying on *Mescalero*, Defendant asserts that King Mountain's claim contradicts long-established law of the highest court that absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State.  *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973).

Defendant points out that Plaintiffs' travel cases (*Smiskin*, *Fiander*, *Ramsey*, *Cree*) are inapposite as none of those cases deal with regulations similar to the escrow statutes that regulate the product itself that is subject of commerce, rather than how such a product is brought to market.  Similarly, Defendant points out that because the tobacco product manufacturer retains rights in its deposits and the money is not transferred to the State except in the event of settlement or judgment, the escrow requirement differs from a typical tax.  Therefore,

the cases relied upon by Plaintiffs holding taxes are improper as to the Indians are not applicable to the facts of this case.

Citing *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163 (1989), which involved a non-Indian company that operated by way of an oil and gas lease on land owned by the United States in trust for the Jicarilla Tribe, Defendant argues the highest court held that the mere fact that the state tax imposes some limit on the profitability of Indian oil and gas leases was too indirect to reject state taxation. *Id*. at 191. Defendant contends the argument made by Plaintiffs here is even weaker than the argument made on behalf of Jicarilla Tribe because mineral leases were the primary source of the Jicarilla Tribe's operating revenues. King Mountain, although owned by a Yakama member, is a private rather than a tribal enterprise.

In a similar vein, Defendant explains that Washington's escrow statutes are not a "precondition" to King Mountain engaging in economic activity. King Mountain need not comply with the escrow statute to grow tobacco on its land. Rather, Washington law imposes non-discriminatory requirements when King Mountain chooses to sell cigarettes to nonmembers in Washington. The mere fact that the escrow requirement reduces profits partially derived from reservation land is not enough to demonstrate interference with the use and benefit of Yakama land. Defendant supports this argument with the *Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 155 (1980) case.

Defendant also argues that tobacco products threaten public health

ORDER - 13

and are squarely within a State's police power to promote public health, safety, welfare and morals. *Star Scientific, Inc. v. Beales*, 278 F.3d 339, 361 (8th Cir. 2002). As a tobacco product manufacturer, King Mountain shares in its responsibility as it relates to the sale and distribution of cigarettes in Washington. Defendant concludes that the State has a legitimate and regulatory interest in ensuring that King Mountain fulfills its obligation in Washington for the damages caused by its product to non-members on and off the reservation.

**B.    King Mountain Products Are State-Tax Exempt**

Plaintiffs assert that Washington State has acknowledged that King Mountain products are state-tax exempt. Therefore, Plaintiffs conclude, the sales of King Mountain products are not subject to State escrow obligations.

Defendant disagrees as to the conclusion but concedes the Attorney General recognizes that sales made on the Yakama reservation to Yakama members or members of compact tribes are not subject to the State's escrow requirements because the "units sold" definition includes only sales subject to the state excise tax.[1]

The Washington State Department of Revenue letter ruling relied on by King Mountain expressly states that King Mountain must escrow for the sales at issue in this lawsuit. In 2007, the Department of Revenue provided King Mountain a letter ruling regarding which sales are subject

_____

[1]ECF No. 94 at 32, footnote 5.

ORDER - 14

to state excise taxes. ECF No. 36-5.  The letter ruling states (subject to certain conditions) that sales by King Mountain of cigarettes manufactured and sold within the reservation are state tax exempt. But the Department also clearly informed King Mountain that "subsequent sales by purchasers" who are either non-Indian or non-member Indians either on or off the reservation and the Yakama Tribe or a Yakama member for selling activity taking place off the reservation were not tax exempt. The same ruling also required compliance with applicable provisions of the MSA.   In sum, Defendant states the Department of Revenue letter ruling exempts from state excise taxes certain direct sales by King Mountain within the reservation, but does not exclude from state excise tax those indirect "downstream" sales to Indians, non-Indians and Indian tribal members.

**VI.  ANALYSIS**

It is well-settled that a state can regulate (i) off-reservation transactions conducted by native Americans; (ii) on-reservation sales to persons other than Native Americans; and (iii) impose certain requirements upon Native Americans in regulating those sales.  *Omaha Tribe of Nebraska v. Miller*, 311 F.Supp.2d 816, 826 (S.D. Iowa 2004) (citations omitted). Courts have repeatedly held that the mere fact that a regulation or tax decreases revenue for an Indian tribe does not mean the regulation or tax interferes with sovereignty rights or the Indian Commerce Clause.  *State of Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 156 (1980).  Long-established Supreme

ORDER - 15

Court law provides that, "Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973).

King Mountain's operations involve extensive off-reservation activity. Uncontroverted evidence was presented that approximately 37.9% of the tobacco used by King Mountain to manufacture its products was grown on trust land in 2011, and approximately 9.5% in 2010, with the balance of tobacco being purchased from a source in North Carolina. ECF No. 95. King Mountain's business involves (1) shipping tobacco to Tennessee, where it is threshed, (2) shipping tobacco to North Carolina, where King Mountain tobacco is blended with Alliance One tobacco, (3) transporting the blended tobacco on its trucks from North Carolina back to Washington, (4) advertising its cigarettes in multiple states through trade shows and the Internet, and (5) selling its cigarettes (through a distributor) to retail stores throughout Washington (and multiple other states) that ultimately sell cigarettes to consumers.

When taking into account the manufacturing process and the amount of non-trust-land tobacco that is used in King Mountain's products, the Court finds that the cigarettes and roll-your-own tobacco products produced by King Mountain are not principally generated from the use of reservation land and resources. In sum, the <u>finished</u> cigarettes and roll-your-own tobacco are not directly derived from trust land. The

principle in *Mescalero* applies to King Mountain. King Mountain has not met its burden of showing express federal law exempting its business from state regulation nor does it offer case authority invalidating application of any state's escrow statute based on an Indian Treaty or any other federal law.

As for King Mountain's claim that the Washington escrow statute discriminates against it, the Court rejects this argument. The Court finds the Washington escrow statutes are non-discriminatory state laws of general application and apply to all NPMs, and not just to Indian Tribes or tribal members. The escrow statutes' purpose is to impose the financial burdens from costs associated with illness resulting from cigarettes on tobacco product manufacturers rather than the states. See Wash. Rev. Code § 70.157.010(d). This includes all tobacco product manufacturers not participating in the MSA. The Court finds the Fourth Circuit Court of Appeals' explanation in *Star Scientific, Inc. v. Beales*, 278 F.3d 339 (4th Cir. 2002) instructive. The appellate court explained that the State's "decision to require nonparticipating manufacturers to place funds in an escrow account is not 'invidious discrimination' or a 'wholly arbitrary act.' Rather, it is a rational system for assessing tobacco manufacturers for the costs of cigarette smoking as well as regulating their conduct to the extent that they were sued and agreed to resolve that suit through settlement." *Id*. at 354 (citation omitted).

Additionally, the Court notes there are a number of cases that have upheld the Master Settlement Agreement and the escrow statutes as

ORDER - 17

legitimate, non-discriminatory legislation. E.g., *Grand River Enterprises Six Nations, Ltd. v. Beebe*, 574 F.3d 929, (8th Cir. 2009), cert. denied, 130 S. Ct. 2095 (2010) (rejecting challenges to Master Settlement Agreement and Escrow statutes on grounds of antitrust, commerce clause, equal protection and procedural due process grounds); *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007); (upholding denial of preliminary injunction to state's enforcing the escrow statutes); *Sanders v. Brown*, 504 F.3d 903 (9th Cir. 2007) (rejecting anti-trust challenges to Master Settlement Agreement escrow statutes).

**VII. CONCLUSION**

Based on the finding above that the finished cigarettes and roll-your-own tobacco are not directly derived from trust land, King Mountain can prove no set of facts in support of the claim that Washington's escrow statutes are in conflict with the Treaty or federal law which would entitle Plaintiffs to relief. Escrow is required for all non-exempt sales subject to the State's cigarette taxes, regardless whether those sales occur on or off the reservation. Escrow is <u>not</u> required for tax exempt King Mountain sales of cigarettes purchased directly by enrolled members of federally recognized Indian tribes from an Indian tribal jurisdiction of the member's tribe for the member's own use. If there were any past sales that were exempt from state excise tax, but for which King Mountain has deposited money into escrow anyway, King Mountain has failed to offer evidence in support of a refund claim

ORDER - 18

and the court expresses no opinion concerning the same.  Accordingly, King Mountain, a NPM, is required to comply with the escrow statute for all past and future sales deemed "units sold."

**IT IS ORDERED:**

1.  Plaintiffs' Motion For Summary Judgment, **ECF No. 85**, is **DENIED**.

2.  Defendant's Motion For Summary Judgment, **ECF No. 90**, is **GRANTED**.

3.  Defendant's Motion to Strike Plaintiffs' New Legal Theory and Related Factual Submission, **ECF No. 107**, is **GRANTED in part**.

4.  Plaintiff's Motion to Strike Reports and Exclude Testimony of Emily Greenwald, **ECF No. 74**, is **DENIED as MOOT**.

The District Court Executive is directed to enter this Order and enter judgment consistent herewith.

**DATED** this 5th day of April, 2013.

                         *s/Lonny R. Suko*
                         _____
                              LONNY R. SUKO
                         UNITED STATES DISTRICT JUDGE

ORDER - 19